UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

KMART CORPORATION                                                    PLAINTIFF

v.                                         CIVIL ACTION NO. 1:11-CV-00103-GHD-DAS

THE KROGER CO.; E & A SOUTHEAST
LIMITED PARTNERSHIP; FULTON IMPROVEMENTS, LLC;
KANSAS CITY RAILWAY COMPANY; and CITY OF CORINTH          DEFENDANTS

**MEMORANDUM OPINION GRANTING CITY OF CORINTH'S MOTION TO DISMISS
OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

Presently before the Court is an amended motion to dismiss or, in the alternative, motion

for summary judgment [85] filed by Defendant, City of Corinth.[1]  Upon due consideration, the

Court finds the motion should be granted.

### A. Factual and Procedural Background

The Corinth, Mississippi Kroger store and Kmart store are neighboring tenants in the

Fulton Crossing Shopping Center.  In May of 2010, heavy rain pelted the Corinth area, causing

nearby Elam Creek to flood.  The Corinth Kmart store sustained extensive flood damage and was

closed for repairs from the time of the May 2010 flood until February 2011, when the store

reopened for business.  The Corinth Kmart store then incurred further additional costs to prevent

subsequent damage from another anticipated flood event.

Kmart Corporation ("Kmart") brings this action against Defendants The Kroger Co.; E &

A Southeast Limited Partnership; Fulton Improvements, LLC; Kansas City Southern Railway

---

[1]  The City amended its initial motion to dismiss or, in the alternative, motion for summary judgment [84] to change the date of the motion from October 25, 2011 to October 26, 2011, the date the motion was actually filed.

Company; and the City of Corinth (the "City") to recover for the flood damage sustained by the Corinth Kmart store.[2]   Kmart alleges, *inter alia*, that the neighboring building occupied by the Corinth Kroger store was initially constructed halfway in the floodplain and halfway in the floodway, and that in 2005, thirteen years after the Kroger store building was constructed, the Federal Emergency Management Agency ("FEMA") issued a Letter of Map Revision ("LOMR") that allowed the Kroger store to remain in the floodway after finding it was inadvertently included in the floodway.   As the motion before the Court solely challenges Kmart's claims against the City, the Court will focus its attention on those claims.

Kmart alleges that the City **(1)** "improperly aided and supported" the issuance of the LOMR that allowed the Corinth Kroger store to remain in the floodway, Kmart's Compl. [1] ¶¶ 15, 41; and **(2)** contributed to the flood damage by operating a ten-acre landfill for dirt in the floodplain adjacent to the Kmart store that contributed to water displacement and a heightened water level in the vicinity of the Kmart store—specifically, reducing the size of the floodplain and the area available for water displacement—and that "[t]he displaced, rushing, and forceful water resulted in extensive flood damages to [the Corinth Kmart store]," *id.* ¶¶ 17, 43–44.

On August 2, 2010, Kmart sent a Notice of Claim to the City outlining the alleged damages incurred by its Corinth store, pursuant to Mississippi Code § 11-46-11.  *See* Kmart's Notice of Claim [1] at 17–20.   In a letter dated October 19, 2010, the City denied liability for Kmart's claims and further stated that the City was exempt from liability under Mississippi Code § 11-36-9(1a, b, d, & h).  *See* City's Denial Letter [1] at 21.  Kmart subsequently brought this

---

[2] Although Kmart also brought this action against the Federal Emergency Management Agency ("FEMA"), FEMA has since been dismissed from the case on sovereign immunity grounds.  *See* Court's Order [50] and Mem. Op. [51] Granting FEMA's Mot. Dismiss.

action on May 2, 2011. On August 5, 2011, the City answered Kmart's complaint and included in its affirmative defenses the defense of immunity based on the discretionary function exemption of the Mississippi Tort Claims Act (the "MTCA"), Mississippi Code § 11-46-9(1)(d). City's Answer [19] at 2.

On October 26, 2012, the City filed the present motion to dismiss or, in the alternative, motion for summary judgment [85], wherein it presents the following arguments in support of dismissal: (1) the state-law claims against the City are barred under the National Flood Insurance Act (the "NFIA"), 42 U.S.C. § 4001 *et seq.*, as the NFIA does not create a state-law cause of action; (2) the state-law claims against the City are preempted by the NFIA, because state tort remedies would conflict with the "sole relief" provided by 42 U.S.C. § 4014, and this conflict would serve as an obstacle to the implementation of the NFIA; (3) Kmart failed to exhaust the administrative remedies set forth in 42 U.S.C. § 4014, as is required of a claim brought under the NFIA; (4) the Mississippi Code forecloses the state-law claims because (a) the state-law claims against the City are barred by the MTCA's one-year statute of limitations; (b) the City is immune from suit under Mississippi Code Section 11-46-9(1)(a) because the claims "aris[e] out of a legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature"; (c) the City is immune from suit under Mississippi Code Section 11-46-9(1)(b) because the City exercised ordinary care; (d) the City is immune from suit under Mississippi Code Section 11-46-9(1)(d)'s discretionary function exception; and (e) the City is immune from suit on any claim arising out of its approval of the LOMR, if any, to the extent it was authorized to do so and acted in a way that was not malicious, arbitrary, or capricious, pursuant to Mississippi Code Section 11-46-9(1)(h); and (5) Kmart has failed to state a viable claim against the City. Because

the Court finds the City immune under the MTCA's discretionary function exemption, the Court need not address the City's arguments for dismissal under the NFIA or under the other exemptions of the MTCA.

### B. Rule 12(b)(1) Standard

A court must address a Rule 12(b)(1) jurisdictional challenge before addressing a challenge on the merits, as doing so "prevents a court without jurisdiction from prematurely dismissing a case with prejudice." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "Federal courts are courts of limited jurisdiction; without jurisdiction conferred by statute, they lack the power to adjudicate claims." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994); *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998)). A claim is "properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate" the claim. *Home Builders Ass'n, Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (internal citation omitted).

"[A] factual attack under Rule 12(b)(1) may occur at any stage of the proceedings, and plaintiff bears the burden of proof that jurisdiction does in fact exist." *Arena v. Graybar Elec. Co.*, 669 F.3d 214, 223 (5th Cir. 2012) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980) (citations omitted)). In such a consideration, the court must take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff. . . . [U]nder Rule 12(b)(1), the court may find a plausible set of facts by considering any of the following: (1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's

4

resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (citations and internal quotation marks omitted). A court should grant the motion only if it seems certain that the plaintiff cannot prove any set of facts in support of his claim –that would entitle him to relief. *Ramming*, 281 F.3d at 161 (citing *Home Builders Ass'n*, 143 F.3d at 1010).

### C. Rule 56 Summary Judgment Standard

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d). Because in considering the present motion the Court has reviewed the parties' attached matters outside the pleadings which this Court shall not exclude, the motion shall be considered a motion for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). *See* FED. R. CIV. P. 56(a); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S. Ct. 2548.

The party moving for summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record it believes demonstrate

the absence of a genuine dispute of material fact. *Id.* at 323, 106 S. Ct. 2548. Under Rule 56(a), the burden then shifts to the nonmovant to "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S. Ct. 2548; *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001); *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995).

Where, as here, the parties dispute the facts, the Court must view the facts and draw reasonable inferences in the light most favorable to the plaintiff. *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal citations omitted). "However, a nonmovant may not overcome the summary judgment standard with conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McClure v. Boles*, 490 F. App'x 666, 667 (5th Cir. 2012) (per curiam) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007)).

### D. Analysis and Discussion

After careful consideration, the Court finds that the City is entitled to immunity on Kmart's claims that the City **(1)** improperly aided and supported the issuance of the LOMR that allowed the Corinth Kroger store to remain in the floodway and **(2)** contributed to the flood damage by operating a ten-acre landfill for dirt adjacent to the Kmart store that contributed to water displacement and a heightened water level in the vicinity of the Kmart store. The City is entitled to immunity under the discretionary function exemption of the MTCA, as Kmart's claims against the City involve an element of choice or judgment, and the choices or judgments involve social, economic, or political policy.

6

The MTCA provides the exclusive civil remedy against a governmental entity or its employee for acts or omissions which give rise to a claim or suit. MISS. CODE ANN. § 11–46–7(1). The MTCA waives sovereign immunity for tort claims for money damages against governmental entities and their employees. *Dancy v. E. Miss. State Hosp.*, 944 So. 2d 10, 15 (Miss. 2006). However, there are twenty-five specific exemptions from the general waiver of sovereign immunity. *See* MISS. CODE ANN. § 11–46–9(1). If any one of these exemptions applies, "the government is completely immune from the claims arising from the act or omission complained of." *McAllister v. Desoto County, Miss.*, 470 F. App'x 313, 321 (5th Cir. 2012) (quoting *Knight v. Miss. Transp. Comm'n*, 10 So. 3d 962, 971 (Miss. Ct. App. 2009) (citations and internal quotation marks omitted)); *see City of Jackson v. Doe*, 68 So. 3d 1285, 1289 (Miss. 2011) ("Because the City qualifies for immunity under subsection (d), the conditions for immunity under subsection (v) are irrelevant."); *Estate of Carr v. City of Ruleville*, 5 So. 3d 455, 458 (Miss. Ct. App. 2008) (finding that "[b]ecause the trial court [correctly] determined that the City was entitled to the discretionary function immunity," the court need not address "whether the City was immune under the police protection provision"). "The basis for the immunity given to government officials is in the inherent need to promote efficient and timely decision-making without fear of liability. This . . . works to encourage free participation and hinder fear that goes with risk-taking situations and the exercise of sound judgment." *Urban Developers LLC v. City of Jackson, Miss.*, 468 F.3d 281, 306 (5th Cir. 2006) (quoting *Miss. Dep't of Transp. v. Cargile*, 847 So. 2d 258, 268 (Miss. 2003)).

One such exemption, the discretionary function exemption, is provided in Mississippi Code § 11–46–9(1)(d): "A governmental entity and its employees acting within the course and

7

scope of their employment or duties shall not be liable for any claim . . . [b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused." The Mississippi Supreme Court has stated that "[a] duty is discretionary when it is not imposed by law and depends upon the judgment or choice of the government entity or its employee." *Miss. Transp. Comm'n v. Montgomery*, 80 So. 3d 789, 795 (Miss. 2012). Poor judgment in the exercise of discretionary authority is insufficient to pierce sovereign immunity. *Sykes v. Grantham*, 567 So. 2d 200, 212 (Miss. 1990). A duty is ministerial, and thus not covered by the immunity provisions of the MTCA, "if it is positively imposed by law and required to be performed at a specific time and place, removing an officer's or entity's choice or judgment." *Montgomery*, 80 So. 3d at 795.

"Whether [a particular] duty . . . is ministerial or discretionary hinges on which statute controls the [activity]." *Miss. Dep't of Transp. v. Nosef ex. rel. Cowart*, 110 So. 3d 317, 319 (Miss. 2013). Narrow, precise, and specific instructions in the applicable statute are more likely to render the activity a ministerial function for which the governmental entity is not immune. *See id.* at 320–21; *Barr v. Hancock County*, 950 So. 2d 254, 258 (Miss. Ct. App. 2007). General instructions requiring choice or judgment, as well as the absence of an applicable statute, are more likely to render the activity a discretionary function for which the governmental entity is immune.

To determine whether a duty is discretionary, the Court must employ the two-part public-function test developed by the Mississippi Supreme Court:[3] (1) Determine whether the act

---

[3] Recently, the Mississippi Supreme Court expressly overruled previous cases that had interpreted Mississippi Code § 11–46–9(1)(d) in conjunction with Section 11–46–9(1)(b) to find that, if a duty fell within a statute, the governmental entity had to exercise ordinary care in order to be immune from suit. *Montgomery*, 80 So. 3d at 797 (overruling *Cargile*, 847 So. 2d 258; *Brewer v. Burdette*, 768 So. 2d 920 (Miss. 2000); *L.W. v. McComb*

involved "an element of choice or judgment;" and (2) if so, determine "whether the choice involved social, economic, or political policy." *Montgomery*, 80 So. 3d at 795 (holding that the public-function test is the determinative test of whether a governmental entity has performed a discretionary act and overruling earlier cases that had applied the public-function test with an ordinary-care standard in determining whether the governmental entity performed a discretionary act); *see also Jones v. MDOT*, 744 So. 2d 256, 260 (Miss. 1999) (citing *United States v. Gaubert*, 499 U.S. 315, 322, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991) (in establishing the test)).

The discretionary function exemption has been held to apply in a variety of situations. *See, e.g., Dozier v. Hinds County*, 354 F. Supp. 2d 707, 714–15 (S.D. Miss. 2005) (county's decision on where and how to place road construction signs was discretionary function); *Fortenberry v. City of Jackson*, 71 So. 3d 1196, 1200 (Miss. 2011) (city's operation and maintenance of its sewage system was discretionary function); *City of Greenwood v. Provine*, 108 So. 284, 286 (Miss. 1926), *accord L & F Homes and Dev., LLC v. City of Gulfport, Miss.*, Civil Action No. 1:10cv387HSO–JMR, 2012 WL 2994073, at *5 (S.D. Miss. July 20, 2012) (considerable discretion is afforded to municipalities in rendering decisions on the provision of new water services); *Little v. Miss. Dep't of Transp.*, --- So.3d ----, 2012 WL 4785205, at *3 (Miss. Ct. App. 2012) (MDOT's "maintenance of the highway's right-of-way is a discretionary function"); *Farris v. Miss. Transp. Comm'n*, 63 So. 3d 1241, 1245 (Miss. Ct. App. 2011)

---

*Separate Mun. Sch. Dist.*, 754 So. 2d 1136 (Miss. 1999)); *see also Simpson County v. McElroy*, 82 So.3d 621, 624 Miss. Ct. App. 2011) (citing Shelly Mott Diaz & Robert A. Weems, *Exempt or Not Exempt: Clarifying the Confusion Surrounding the Relationship Between the Discretionary Function Exemption and the Performance of Statute Exemption in the Mississippi Tort Claims Act*, 80 MISS. L.J. 45 (2010) (discussing the proper application of Section 11–46–9(1)(b)). The Mississippi Supreme Court clarified that "in determining whether a governmental entity is exempt from liability under Section 11–46–9(1)(d), the two-part public-function test . . .must be used." *Montgomery*, 80 So. 3d at 797.

(MDOT's failure to remove trees from the highway's right-of-way fell within the discretionary-function exemption).

In the case *sub judice*, the Court finds that the City's alleged actions **(1)** in aiding and support the issuance of the subject LOMR and **(2)** placing fill in the floodplain adjacent to the Kmart store involved an element of choice or judgment and that the choices involved social, economic, and/or political policy. Thus, the Court finds that the City is immune from suit on both claims against it under the discretionary function exemption.

1. **The City's alleged action in aiding and supporting the issuance of the subject LOMR is a discretionary function, and thus, the City is immune from suit under the MTCA on this claim.**

   a. **The City's alleged action in aiding and supporting the issuance of the subject LOMR involved an element of choice or judgment.**

Kmart alleges that the City improperly aided and supported the issuance of the LOMR that allowed Kroger to remain in the floodway, with no scientific basis for doing so. Kmart's Mem. Br. Supp. Resp. Opp'n to City's Mot. [101] at 14–17. Kmart contends that the City had ministerial duties in this respect based on certain provisions of the NFIA, namely: (1) "a community shall notify the Administrator of the changes [in a community's base flood elevations affecting flooding conditions] by submitting technical or scientific data," 44 C.F.R. § 65.3; and (2) a community "has a right to request changes to any of the information shown on an effective map that does not impact flood plain or flood plain delineations," but that in order to achieve a change, the community shall submit "appropriate supporting documentation," 44 C.F.R. § 65.4. Kmart maintains that although FEMA was found immune from suit for its flood mapping determinations, including those made in issuing the subject LOMR, the City is not immune from suit on the claim that the City improperly sought out a LOMR without scientific support. Kmart attempts to draw a

distinction between the issuance of the LOMR itself and "the City's actions in seeking to **change** the flood elevation determination of FEMA," and contends that Kmart is "challenging the very process used by the City to apply for the LOMR, as Kmart cannot find any existence of a scientific basis for the LOMR being presented to FEMA in the first place." *See* Kmart's Mem. Br. Supp. Resp. Opp'n to City's Mot. [101] at 16–17 (emphasis in original). Thus, Kmart contends that the City is not entitled to immunity under the discretionary function exemption for its alleged actions in aiding and supporting the issuance of the subject LOMR.

The City contends that its decision to aid and support the issuance of the subject LOMR was a discretionary function which entitles it to sovereign immunity under the MTCA. The City argues that the above-referenced directives in the NFIA do not affirmatively require or prohibit the City's decision to assist in the LOMR request, but instead concern actions the community must take if it decides to request that FEMA make changes to Flood Insurance Rate Maps ("FIRMs"). The City further argues that the discretionary function exemption of the MTCA closely mirrors that of the Federal Tort Claims Act (the "FTCA"): just as Kmart's claims against FEMA were dismissed because the claims concerned flood mapping, a discretionary function exempted from liability under 28 U.S.C. § 2680(a) of the FTCA, the City is also immune from suit on Kmart's claim against that the City improperly aided and supported the issuance of the subject LOMR. The City maintains that Kmart is suing the City for its decision to assist in the pursuit of the LOMR by providing a Community Acknowledgment Form, not for any actions or inactions concerning the above-referenced directives. The City further maintains that no evidence exists that the City itself applied for the LOMR. Finally, the City maintains that no statute, ordinance, or regulation governs the City's decision to aid and support in the issuance of the LOMR, and thus, that any such

11

decision contains an element of choice or judgment in satisfaction of the first prong of the public-function test.

To determine whether an element of choice or judgment was involved in the City's decision to aid and support the issuance of the LOMR, the Court first looks to any possible statute, ordinance, or regulation that governed the City's decision to aid and support in the issuance of the LOMR. The Court notes that general, less specific statutory language tends to indicate a discretionary duty, while narrow, precise, and specific statutory language tends to indicate a ministerial duty. *See Cowart*, 110 So. 3d at 320–21 (language in one statute that the traffic commissioner "shall place and maintain such traffic-control devices conforming to its manual and specifications . . . as it shall deem necessary to indicate" held to indicate discretionary duty; language in another statute that "[a]ll culverts . . shall be not less than the full width of the crown of the roadway, and shall have guide or warning posts on either side" held to indicate ministerial duty).

First, the Court examines the NFIA. The NFIA provides in pertinent part that in addition to implementing "a program of flood insurance which can complement and encourage preventive and protective measures," 42 U.S.C. § 4001(a)(3), that

> [i]t is the further purpose of this chapter to (1) encourage State and local governments to make appropriate land use adjustments to constrict the development of land which is exposed to flood damage and minimize damage caused by flood losses, (2) guide the development of proposed future construction, where practicable, away from locations which are threatened by flood hazards, . . . .

42 U.S.C. § 4001(e). The NFIA "require[s] States or local communities, as a condition of future Federal financial assistance, to participate in the flood insurance program and to adopt adequate flood plain ordinances with effective enforcement provisions consistent with Federal standards to

reduce or avoid future flood losses[.]" 42 U.S.C. § 4002(b)(3) (emphasis added). This statutory language indicates that local governments—including cities—are given a certain amount of latitude to adopt ordinances that comport with federal standards. Another way of saying this is that cities are allowed discretion in implementing their local flood prevention and protective measures. One of the methods of flood prevention and protection is flood-mapping and revisions of floodplain areas and flood-risk zones. The NFIA provides in pertinent part:

> The Administrator shall revise and update any floodplain areas and flood-risk zones—
>
> . . .
>
>> upon the request from any State or local government stating that specific floodplain areas or flood-risk zones in the State or locality need revision or updating, if sufficient technical data justifying the request is submitted and the unit of government making the request agrees to provide funds in an amount determined by the Administrator.

42 U.S.C. § 4101(f). Related regulations, as cited by Kmart, include the following: (1) "a community shall notify the Administrator of the changes [in a community's base flood elevations affecting flooding conditions] by submitting technical or scientific data," 44 C.F.R. § 65.3; and (2) a community "has a right to request changes to any of the information shown on an effective map that does not impact flood plain or flood plain delineations," but that in order to achieve a change, the community shall submit "appropriate supporting documentation," 44 C.F.R. § 65.4. The Court notes that all of these provisions indicate that although a local government may submit a request to FEMA for a flood map revision or update, FEMA has the ultimate authority to grant or deny such a request. FEMA will grant such a request only if sufficient technical data justifying the request is submitted and the City agrees to provide funds. Any duties that could be extracted from this statutory language pertaining to the City would be **(a)** acquiring the appropriate technical

13

data to support the map revision request, **(b)** completing the necessary forms for the request submission, and **(c)** agreeing to provide the necessary funding. The matter of acquiring the appropriate technical data to support the request would obviously involve an analysis of the available data and judgment to determine which data would support the request to revise the flood maps. Even completing the necessary forms would require choice or judgment on the part of the local government in the individual tasks required in the course of submitting the LOMR request. For all these reasons, the Court finds that the NFIA does not give the City a ministerial duty with respect to aiding and supporting a LOMR request.

Second, the Court looks to the City's flood control ordinances in effect at the time of the subject events. The ordinances provide that "[t]he areas of special flood hazard are identified by [FEMA in FIRMS]." CORINTH, MISS. ORDINANCES ch. 12, art. I, § 12-8 (2008).

The ordinances also provide the following definitions:

> *Letter of map change (LOMC)* is an official FEMA determination, by letter, to amend or revise effective [FIRMs], Flood Boundary and Floodway Maps, and Flood Insurance Studies. LOMC's are broken down into the following categories:
>
>> Letter of Map Amendment (LOMA). A revision based on technical data showing that a property was incorrectly included in a designated [Special Flood Hazard Area]. A LOMA amends the current effective FIRM and establishes that a specific property is not located in a [Special Flood Hazard Area].
>>
>> Letter of Map Revision (LOMR). A revision based on technical data that, usually due to manmade changes, shows changes to flood zones, flood elevations, floodplain and floodway delineations, and planimetric features. One common type of LORM, a LOMR-F, is a determination concerning whether a structure or parcel has been elevated by fill above the BFE and is, therefore, excluded from the [Special Flood Hazard Area].

14

. . . .

*Id.*, ch. 12, art. I, § 12-5. Floodplain management is "the operation of an overall program of corrective and preventive measures for reducing flood damage and preserving and enhancing, where possible, natural resources in the floodplain, including but not limited to emergency preparedness plans, flood control works, floodplain management regulations, and open space plans." *Id.* The City's floodplain administrator is "the individual appointed to administer and enforce the [City's] floodplain management regulations." *Id.* The floodplain administrator and his staff have certain duties, some of which are enumerated in the ordinance ("Duties of the [f]loodplain [a]dministrator and/or his staff shall include, but not be limited to the following . . . ."). The duties which are set forth in the ordinance highlight the discretionary nature of the floodplain administrator's position:

> (1) **Reviewing** all development permits to ensure that the permit requirements of this chapter are satisfied.

> (2) **Advising** the permittee that additional federal or state permits may be required, and if specific federal or state permit requirements are known, requiring that copies of such permits be provided and maintained on file with the development permit.

> (3) Notifying adjacent communities, the State NFIP coordinator, and other federal and/or state agencies with statutory or regulatory authority prior to any alteration or relocation of a watercourse.

> (4) **Ensuring** that maintenance is provided within the altered or relocated portion of such watercourse so that the flood-carrying capacity is not diminished.

> (5) Verifying and recording the actual elevation, in relation to mean sea level, of the lowest floor (including basement) of all new or substantially improved structures, in accordance with section 12-57.

(6)     Verifying and recording the actual elevation, in relation to mean sea level, to which the new or substantially improved structures have been floodproofed, in accordance with subsection 12-57(2).

(7)     When floodproofing is utilized for a particular structure, obtaining certification from a registered professional engineer or architect, in accordance with subsection 12-57(2).

(8)     Where interpretation is needed as to the exact location of boundaries of the areas of special flood hazard, for example, where there appears to be a conflict between a mapped boundary and actual field conditions, **making the necessary interpretation**. The person contesting the location of the boundary shall be given a reasonable opportunity to appeal the interpretation as provided in the chapter.

(9)     When base flood elevations data or floodway data have not been provided in accordance with section 12-8, obtaining, **reviewing and reasonably utilizing any base flood elevation and floodway data** available from a federal, state or other source, in order to administer the provisions of Article IV of this chapter.

(10)     Maintaining all records pertaining to the provisions of this chapter in his office, which records shall be open for public inspection.

(11)     Maintaining the records of all appeal actions pursuant to this chapter and upon request reporting any variances to [FEMA].

(12)     **Provide information, testimony or other evidence, as needed** during variance request hearings.

(13)     When damage occurs to a building or buildings, conducting the following actions:

> a)     **Determining** whether damaged structures are located within the Special Flood Hazard Area;

> b)     **Conducting** damage assessments for those damaged structures located in the [Special Flood Hazard Area];

> c)     **Making a reasonable attempt** to notify owner(s) of damaged structure(s) of the requirement to obtain a building

> permit/floodplain development permit prior to repair,
> rehabilitation, or reconstruction.

*Id.*, ch. 12, art. II, § 12-32 (emphases added). The language of the ordinance, including the

language that the floodplain administrator's duties are not limited to those enumerated in the

ordinance, indicates that the floodplain administrator's duties are largely discretionary, requiring

choice or judgment. *See Farris*, 63 So. 3d at 1243 (applicable statute provided that state highway

commission's duty was to have state highway department maintain highways "in such a way as to

afford convenient, comfortable, and economic use thereof by the public at all times"; held to

indicate discretionary duty due to absence in statute and standard operating procedures of "specific

directives as to the time, manner, and conditions for carrying out" its duty). For these reasons, the

Court finds that the City's ordinances do not give the City any ministerial duties with respect to

supporting a LOMR request.

Next, the Court views the evidence in the record to determine the nature of the City's

participation in requesting the subject LOMR. Apparently, Flood Zone Correction Inc., which

was retained by the owners of the Fulton Crossing Shopping Center, submitted a LOMA request to

FEMA regarding the Kroger store in the Fulton Crossing Shopping Center. *See* FEMA Letter

[107-4] at 1.[4] Subsequently, FEMA apparently informed Flood Zone Correction Inc. that its

submission was incomplete and instructed it to obtain a completed Community Acknowledgment

Form ("CAF") from a community official in order for the LOMA request to be processed. *See id.*

In general, CAFs are "used to assist requesters (community officials, individual property

owners, and others) in gathering the information that FEMA needs to determine whether property

---

[4] The Court notes that Kmart appears to contend that although the attachments to the motion papers reference a LOMA request that this particular request is the same as the LOMR request referenced in the complaint. *See* Kmart's Mem. Br. Supp. Resp. Opp'n to City's Mot. [101] at 14 ("[The CAF] appears to have been submitted to FEMA as part of the application for the LOMR.").

(i.e., structure(s), parcel(s) of land) is likely to be flooded during the flood event that has a 1-percent chance of being equaled or exceeded in any given year (base, or 100-year, flood). . . ." *See* FEMA Forms, http://www.fema.gov/forms. The CAF "must be completed for requests involving the existing or proposed placement of fill (complete Section A) OR to provide acknowledgment of this request to remove a property from the [Special Flood Hazard Area] which was previously located within the regulatory floodway (complete Section B)[.]" CAF [100-4] at 1; CAF [107-2] at 1.

In FEMA's letter to Flood Zone Correction Inc., FEMA apparently indicated that Section B of the CAF was required to be completed in order for FEMA to process the LOMA request. *See* FEMA Letter [107-4] at 1. As stated above, Section B is designed to "provide acknowledgment of this request to remove a property from the [Special Flood Hazard Area] which was previously located within the regulatory floodway[.]" *See id.*; CAF [107-2] at 1. Thus, by a letter dated October 7, 2005, Flood Zone Correction Inc. apparently requested that the City complete the CAF, and particularly Section B pertaining to the Corinth Kroger store which was located within the regulatory floodway, so that Flood Zone Correction Inc.'s LOMA request packet would be complete. *See* Flood Zone Correction Inc. Letter [107-1] at 1. The City building inspector apparently signed and dated the CAF, completing both Section A, pertaining to requests involving the placement of fill, and Section B, providing acknowledgment of the request to remove the Kroger store from the Special Flood Hazard Area which was previously located within the regulatory floodway and commented on the form: "We need the map revision as soon as possible." *See* CAF [100-4] at 1, CAF [107-2] at 1.

In order to complete the CAF, the City's floodplain administrator was instructed to (1) review the form's instructions, (2) search existing data sources, and (3) gather and maintain the needed data. *See* CAF [100-4] at 1, CAF [107-2] at 1. The Court finds it difficult to imagine how the work required to complete this form for either a LOMA or LOMR request would not involve an element of choice or judgment.

For these reasons, the Court finds that the City's alleged action in aiding and supporting the issuance of the subject LOMR by completing and signing a CAF, was an action concerning flood prevention and control and, as such, involved an element of choice or judgment. Thus, the Court finds that the City has satisfied the first prong of the public-function test. Now, the Court turns to the second prong of the test, namely whether the choice involved social, economic, or political policy.

### b. The City's choice in aiding and supporting the issuance of the subject LOMR involved social, economic, or political policy.

The City argues that any choice to aid and support the issuance of the subject LOMR involved social, economic, and political policy, as the City has a vested interest in having a properly mapped floodplain or floodway in order to receive the benefits that accrue to it under the NFIA, and that even if Kmart could prove that the City was negligent in providing information to FEMA that was utilized in its flood mapping determination, that provision of information would constitute a discretionary function.

Kmart contends that the City's own ordinances show that flood-zone determinations require scientific judgment and concern issues of safety, particularly, including providing certifications by registered engineers and other scientific and technical data to verify that certain actions will not affect the safety and well-being of the community. Kmart maintains that this

means that the City's involvement in the subject LOMR did not involve social, economic, or political policy, and thus that the City is not entitled to immunity under the discretionary function exemption.

The Court finds that the City's decision to aid and support the issuance of the subject LOMR was one involving social, economic, or political policy. With the enactment of the NFIA, Congress found that flood disasters "have required unforeseen disaster relief measures and have placed an increasing burden on the Nation's resources," 42 U.S.C. § 4001(a)(1), and that "despite the installation of preventive and protective works and the adoption of other public programs designed to reduce losses caused by flood damage, these methods have not been sufficient to protect adequately against growing exposure to future flood losses," *id.* § 4001(a)(2). Congress further found that "as a matter of national policy, a reasonable method of sharing the risk of flood losses is through a program of flood insurance which can complement and encourage preventive and protective measures." 42 U.S.C. § 4001(a)(3). Thus, matters of flood control and prevention, including the seeking of revisions to existing flood mapping, necessarily involve economic policy. One of the stated purposes of the NFIA is to "require States or local communities, as a condition of future Federal financial assistance, to participate in the flood insurance program and to adopt adequate flood plain ordinances with effective enforcement provisions consistent with Federal standards to reduce or avoid future flood losses[.]" 42 U.S.C. § 4002(b)(3). The NFIA was designed to "encourage State and local governments to make appropriate land use adjustments to constrict the development of land which is exposed to flood damage and minimize damage caused by flood losses," as well as "guide the development of proposed future construction, where practicable, away from locations which are threatened by

20

flood hazards." 42 U.S.C. § 4001(e).

Mississippi's Urban Flood and Drainage Control Law, Mississippi Code § 51-35-301, although designed to provide for the creation of flood and drainage control districts within the State, is helpful in explaining that the control of overflow and surface waters (as in flood control and prevention measures) affects the safety and general welfare of the people who live in Mississippi as well as the economic development of the state:

> It is hereby declared, as a matter of legislative determination, that . . . the overflow and surface waters of the state have not heretofore been conserved or fully controlled to realize their full beneficial use, that the control of such waters is necessary to insure adequate protection to the inhabitants of the State of Mississippi and their properties, and to the municipalities of the State of Mississippi, to promote the balanced economic development of the state and to aid in flood control, conservation, and development of lands and property, and of the general health and welfare of the people of the State of Mississippi. It is further determined and declared that the diversion and control of the waters of any rivers on their tributaries and their overflow waters in or near municipalities for the protection and development of domestic, municipal, commercial, industrial, and manufacturing functions, for flood control, and for pollution abatement are, as a matter of public policy, for the general welfare of the entire people of the State of Mississippi.

MISS. CODE ANN. § 51-35-303(a).

Similarly, the City's Flood Damage Prevention and Control Ordinance provides that it applies to "all areas of special flood hazard (SFHA) within the jurisdiction of the [City] which may be subject to periodic inundation by floodwaters that can adversely affect the public health, safety[,] and general welfare of the citizens of [the City]." *See* CORINTH, MISS. ORDINANCES ch. 12, art. I, § 12-6 (emphasis added).

The Court finds that the City's choice to participate in the subject LOMR request was a part of the City's role in flood control and prevention and, thus, concerned social, economic, and/or

21

political policy. The City's involvement in the LOMR request was part of the City's participation in the NFIP to help alleviate "the increasing burden on the Nation's resources" due to flood damage losses, 42 U.S.C. § 4001(a)(1)–(2), as well as to ensure that the State of Mississippi continues to receive future Federal financial assistance in dealing with such losses, § 4002(b)(3). Any such flood prevention and control activities thus affect the economic development of the state and the Nation as a whole and are clearly a matter of economic policy. Further, the City's choice to participate in the subject LOMR request involved social policy, as it impacted the "public health, safety[,] and general welfare of the citizens [of the City]," *see* Corinth, Miss. Ordinances ch. 12, art. I, § 12-6. The Mississippi Supreme Court has held that activities promoting the public interest and welfare satisfy the second prong of the public-function test. *See, e.g.*, *Doe*, 68 So. 3d at 1288. For all these reasons, the City's decision to participate in the issuance of the subject LOMR involved social, economic, or political policy, thereby satisfying the second prong of the public-function test. Thus, the City is immune from suit on this claim under the discretionary function exemption to the MTCA.

The Court adds as an afterthought that even if the City were not immune from suit on this claim under the MTCA, the claim would fail on its merits. At most the evidence before the Court raises a genuine dispute of material fact as to whether the City <u>sought</u> a LOMR that allowed the Kroger store to remain in the floodway. Although Kmart alleges that the City acted with "impropriety in what is believed to have been an attempt to protect Kroger from being in an actual floodway," *see* Kmart's Mem. Br. Supp. Resp. Opp'n to City's Mot. [101] at 19, the Court does not find any evidence in the record to support a claim that the City <u>improperly</u> sought a LOMR that allowed the Kroger store to remain in the floodway. Thus, this claim is also dismissible on its

22

merits as a conclusory allegation unsupported by the record. For all these reasons, Kmart's claim that the City improperly aided and supported the issuance of the subject LOMR shall be dismissed. The Court now turns to Kmart's second claim against the City.

**2. The City's action in operating the ten-acre landfill for dirt in the floodplain adjacent to the Kmart store is a discretionary function, and thus, the City is immune from suit under the MTCA on this claim.**

    **a. The City's action in operating the ten-acre landfill for dirt in the floodplain adjacent to the Kmart store involved an element of choice or judgment.**

Kmart maintains that the City's use of the ten-acre section of land in the floodplain adjacent to the Kmart store contributed to a water displacement and a heightened water level in the vicinity of the Corinth Kmart store, reduced the size of the floodplain and the area available for water displacement, and ultimately resulted in the flood damages incurred by the Corinth Kmart store. "Fill" is defined in the City Ordinances as a deposit of earth material placed by artificial means, *see* Corinth, Miss. Ordinances ch. 12, art. I, § 12-5, and is defined by FEMA as "material from any source placed to raise the ground to or above the Base Flood Elevation (BFE)," FEMA Prop. Info. Form [107-5].

The City maintains that no statute, ordinance, or regulation governs the City's placement of fill within the floodplain, and that the placement of fill in the floodplain is one way that a structure can be brought up to the City's minimum base flood elevation so that a building can be built in the floodplain. The City's floodplain administrator states in an affidavit attached to the City's motion that **(1)** he "noticed several truckloads of dirt that had been dumped on the [City's] property behind the [Corinth Kroger store, the same property referenced in this case]," Huwe Aff. [85-2] ¶ 3; **(2)** he "suspected that the area might be designated as part of the Elam Creek floodway," *id.* ¶ 4; **(3)** "[t]his was confirmed by checking" the newly available digital FIRM, which was "superior to the

23

old FIRM panels in that aerial photography" is included in the maps, *id.* ¶¶ 5–6; and **(4)** "the dirt [was then] moved to the west of this boundary line into an area that is designated as a floodplain" within one week of the discovery of the fill being mistakenly placed in the designated floodway, *id.* ¶¶ 12–13. Huwe states that moving the fill to the floodplain was acceptable because "there is no prohibition under either the [NFIP] or the City's flood zone ordinance on the placement of fill within the floodplain" and "[t]he City's minimum BFE levels, which are more restrictive than those required by the NFIP, can be reached by building a new structure on fill that has been placed on the floodplain." *Id.* ¶ 15. For these reasons, the City maintains that its decision to move the fill to the floodplain involved an element of choice or judgment.

Kmart argues that the City's decision to operate the fill in the floodplain involved a ministerial duty prescribed by the City's Code of Ordinances. Kmart maintains that although the City contends that the fill was moved west from the floodway to the floodplain, *see* Huwe Aff. [85–2] ¶ 12, Kmart has evidence that the area where the City moved the fill material was designated as a Zone AE area, an area where fill material is only permitted under the Code of Ordinances if there is (1) certification by a registered professional engineer demonstrating that the cumulative effect would not increase the water surface elevation more than one foot, and (2) supporting technical data that conforms to standard hydraulic engineering principles. Thus, Kmart maintains that the City's decision to place fill in the floodplain adjacent to the Corinth Kmart store was a ministerial function for which the City is not entitled to immunity.

The City argues in response that the aforementioned ordinance applies only to floodplains without prescribed floodways, and that Kmart has conceded in its complaint that this case concerns a prescribed floodway (as the basis for Kmart's claims is that the Corinth Kroger store was

permitted to remain in a prescribed floodway). *See* Kmart's Compl. [1] ¶ 14. The City thus argues that the aforementioned ordinance does not apply in this situation, and that Kmart has failed to point to any other statute, ordinance, or regulation that would govern the City's placement of fill on its property within a floodplain. Therefore, the City maintains that the City's decision to operate the fill in the floodplain adjacent to the Kmart store involved an element of choice or judgment, and therefore, that the first prong of the public-function test is satisfied.

The Court finds that the ordinance in question provides as follows:

> **In special flood hazard areas with base flood elevations (Zone AE and A1-30) but without floodways,** no encroachments, including fill material or structures, shall be permitted unless certification by a registered professional engineer is provided demonstrating that the cumulative effect of the proposed development, will not increase the water surface elevation of the base flood more than one foot at any point within the community. The engineering certification must be supported by technical data that conforms to standard hydraulic engineering principles.

CORINTH, MISS. ORDINANCES ch. 12, art. IV, § 12-74(2) (emphasis added). As stated, this provision only applies to "special flood hazard areas with base flood elevations (Zone AE and A1-30) but without floodways." *See id.* Kmart argues that the floodplain adjacent to the Kmart store was in a Zone AE area and thus that the directives in the ordinance apply. The Court cannot make this determination at this juncture, as the evidence before the Court does not indicate whether the floodplain adjacent to the Kmart store was in a Zone AE area. However, the Court is not required to make this determination to reach the conclusion that the action of operating the fill in the floodplain involved an element of choice or judgment.

If the ordinance in question does not apply, the City's decision to operate the fill in the floodplain would necessarily involve an element of choice or judgment, as no other source of

authority for a ministerial duty has been cited by Kmart. *See* MISS. CODE ANN. § 11-46-9(1)(d) (providing that where "statutes[, ordinances, or regulations] do not impose any specific directives as to the time, manner[,] and conditions for carrying out the [duties in question,] the duties are not ministerial in nature"). However, even if the City ordinance in question applies, the ordinance does not indicate that the City's floodplain administrator would be engaged in a ministerial duty in operating the fill in the floodplain adjacent to the Kmart store.

The ordinance provides that fill could be located in either of these otherwise restricted zones if "certification by a registered professional engineer is provided demonstrating that the cumulative effect of the proposed development, when combined with all other existing and anticipated development, will not increase the water surface elevation of the base flood more than one foot at any point within the community" and "the engineering certification [is] supported by technical data that conforms to standard hydraulic engineering principles." *See id.* In order for the floodplain administrator to determine whether an exception applied to the general rule that fill could not be located in a Zone AE area, he would have to determine that the certification by the registered professional engineer was supported by technical data that conformed to standard hydraulic engineering principles. This determination would require an analysis and decision that is ultimately made based on the floodplain administrator's choice or judgment. The Court thus finds that even if the ordinance in question does apply, and the floodplain was in a Zone AE area, the City still would have had to exercise discretion to determine whether an exception applied that would allow the fill to be placed in the floodplain. *See, e.g., City of Jackson v. Sandifer*, 107 So. 3d 978, 987 (Miss. 2013) (applicable statute governing municipalities' decisions concerning the termination of employees provided that termination was proper "for any of the following reasons";

held to provide grounds for termination but still requiring municipalities to exercise judgment in employment decisions); *Fisher v. Lauderdale Cnty. Bd. of Supervisors*, 7 So. 3d 968, 971 (Miss. Ct. App. 2009) (in case challenging insufficiency of county's culvert installation, holding that county was immune under the MTCA's discretionary function exemption, because statute pertaining to culvert installation specified length but not size of culvert, thus leaving size of culvert to county's discretion). Having found the first prong of the public-function analysis satisfied, the Court next turns to the second prong of the test.

### b. The City's choice to operate the ten-acre landfill for dirt in the floodplain adjacent to the Kmart store involved social, economic, or political policy.

Kmart maintains that the City cannot carry its burden on the second prong of the public-function test, because the decision to operate the ten-acre landfill in the floodplain involved matters of scientific and professional judgment and should not be considered susceptible to social, economic, or political policy. *See* Kmart's Mem. Br. Supp. Resp. Opp'n to City's Mot. [101] at 30. Kmart maintains that the purpose of the City's entire scheme under its Flood Damage Prevention and Control Ordinance is to "promote the public health, safety, and general welfare[,] and to minimize public and private losses due to flood conditions in specific areas by provisions designated to . . . [c]ontrol filling, grading, dredging[,] and other development which may increase erosion or flood damage." *See id.* (citing CORINTH, MISS. ORDINANCES ch. 12, art. I, § 12-3. Thus, Kmart contends that the City fails to show that its decision to operate the fill in the floodplain involved social, economic, or political policy, and accordingly, fails to satisfy the second prong of the public-function test.

The City argues that the mere fact that the aforementioned City ordinance implicates safety is not enough to remove it from the discretionary function exemption, because it also involves

social aspects, such as restricting the placement of buildings, and economic aspects, such as preventing economic harm from flood loss, and political-policy considerations, such as the City's voluntary participation in the NFIA.

The Court finds the City's argument to be well taken. No case law in the Fifth Circuit could be found supporting Kmart's position that because the fill decision involved matters of scientific judgment it does not involve social, economic, or political policy. The Court similarly found no Fifth Circuit case law supporting Kmart's position that if the fill decision involved safety issues it does not involve social, economic, or political policy. The City's decision to move fill to the floodplain was a matter of flood control or prevention, which as set forth above in in Section 1b is a matter involving social, economic, or political policy. The Court incorporates its analysis in Section 1b and finds that the City's choice to operate the fill in the floodplain involved social, economic, or political policy.

For all the foregoing reasons, the Court holds that the City is entitled to immunity from suit based on the discretionary function exemption.

### E. Conclusion

In sum, Defendant the City of Corinth's motion to dismiss or, in the alternative, motion for summary judgment [85] is GRANTED, as the City is entitled to sovereign immunity from suit under the MTCA's discretionary function exemption, Mississippi Code § 11-46-9(1)(d).

An order in accordance with this opinion shall issue this day.

THIS, _____ 9ᵗʰ _____ day of August, 2013.

_____
SENIOR JUDGE