UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

KMART CORPORATION                                                                                              PLAINTIFF

v.                                                              CIVIL ACTION NO. 1:11-CV-00103-GHD-DAS

THE KROGER CO.; E & A SOUTHEAST
LIMITED PARTNERSHIP; FULTON IMPROVEMENTS, LLC;
and KANSAS CITY SOUTHERN RAILWAY COMPANY                                       DEFENDANTS

## MEMORANDUM OPINION GRANTING DEFENDANT FULTON IMPROVEMENTS, LLC'S MOTION FOR SUMMARY JUDGMENT

Presently before the Court is Defendant Fulton Improvements, LLC's motion for summary judgment [248] concerning the claims against it. Upon due consideration, the Court finds the motion should be granted.

### A. *Factual and Procedural Background*

The Corinth, Mississippi Kroger store and Kmart store are neighboring tenants in the Fulton Crossing Shopping Center. In May of 2010, heavy rain pelted the Corinth area, causing nearby Elam Creek to flood. The Corinth Kmart store sustained extensive flood damage and was closed for repairs from the time of the May 2010 flood until February 2011, when the store reopened for business. The Corinth Kmart store then incurred further additional costs to prevent subsequent damage from another anticipated flood event.

Kmart Corporation ("Kmart") brings this action against Defendants The Kroger Co.; E & A Southeast Limited Partnership; Fulton Improvements, LLC ("Fulton"); and Kansas City Southern Railway Company to recover for the flood damage sustained by the Corinth Kmart store

1

which it alleges was caused by actions and omissions of Defendants.[1] Kmart alleges, *inter alia*, that the neighboring building occupied by the Corinth Kroger store was initially constructed halfway in the floodplain and halfway in the floodway, and that in 2005, thirteen years after the Kroger store building was constructed, the Federal Emergency Management Agency ("FEMA") issued a Letter of Map Revision ("LOMR") that removed the Kroger store from the regulatory floodway after finding it was inadvertently included in the floodway.

As the present motion for summary judgment [248] concerns Kmart's claims against Fulton, the Court will focus its attention on those claims. Fulton is the landlord of the Fulton Crossing Shopping Center where the Corinth Kmart and Kroger stores are located, and was the landlord at the time of the alleged incidents giving rise to this suit. Kmart alleges that Fulton is responsible for the flood damages sustained by the Kmart store because of Fulton's obligations as landlord of the building. Kmart's Compl. [1] ¶ 14.2.

On July 25, 2013, Kmart filed a motion for leave to file a proposed amended report of its retained engineering expert, John R. Krewson, to recalculate the estimated water level to correct prior inaccuracies in Krewson's initial report, and in so doing, to change Kmart's theory of the case. On September 27, 2013, the Court entered an Order [243] stating that it would consider a limited amendment of only mathematical errors to the Krewson report. Kmart filed another

---

[1] Although Kmart also initially brought this action against the Federal Emergency Management Agency ("FEMA") and the City of Corinth, both have since been dismissed from the case on immunity grounds. *See* Ct.'s Order [50] & Mem. Op. [51] Granting FEMA's Mot. Dismiss; Ct.'s Order [209] & Mem. Op. [210] Granting City of Corinth's Mot. Dismiss.

[2] E & A Southeast Limited Partnership was the landlord of both the building occupied by Kroger and the building occupied by Kmart from September 11, 1998 through December 14, 2007. See Kmart's Compl. [1] ¶ 29; E & A's Answer [21] 4, ¶ 29. Fulton Improvements, LLC apparently is now the landlord of both the building occupied by Kroger and the building occupied by Kmart, and was as of the date of subject flooding. See Kmart's Compl. [1] ¶ 52; Fulton's Answer [21] 2, ¶ 11.

2

motion for leave [271] to file a newly proposed amended Krewson report and attached the same for the Court's consideration. After careful consideration of the newly proposed amended report, the Court denied Kmart's request to amend the Krewson report. Accordingly, when this memorandum opinion references the Krewson report, the opinion refers to Krewson's initial report, unless otherwise indicated.

On October 2, 2013, Fulton filed the present motion for summary judgment [248]. Kmart has filed a response, and Fulton has filed a reply. The matter is now ripe for review.

### *B. Summary Judgment Standard*

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). *See* FED. R. CIV. P. 56(a); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S. Ct. 2548.

The party moving for summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine dispute of material fact. *Id.* at 323, 106 S. Ct. 2548. Under Rule 56(a), the burden then shifts to the nonmovant to "go beyond the pleadings and by . . . affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing

3

that there is a genuine issue for trial." *Id.* at 324, 106 S. Ct. 2548 (internal quotation marks omitted). *Accord Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001); *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995).

Where, as here, the parties dispute the facts, the Court must view the facts and draw reasonable inferences in the light most favorable to the nonmovant. *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal citations omitted). "However, a nonmovant may not overcome the summary judgment standard with conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McClure v. Boles*, 490 F. App'x 666, 667 (5th Cir. 2012) (per curiam) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007)).

### *C. Analysis and Discussion*

In its motion for summary judgment [248], Fulton argues that Kmart's breach-of-contract and negligence claims against it should be dismissed, and presents several arguments in support.

#### 1. **Breach-of-Contract Claim**

First, Kmart alleges a breach-of-contract claim against Fulton as landlord of the building with respect to the lease agreement between Kmart and Fulton. A plaintiff asserting a breach-of-contract claim under Mississippi law must ultimately prove (a) the existence of a valid and binding contract, (b) that the defendant has broken or breached it, and (c) that the plaintiff has been thereby damaged monetarily. *Bus. Commc'ns, Inc. v. Banks*, 90 So. 3d 1221, 1124–1225 (Miss. 2012) (citing *Warwick v. Matheney*, 603 So. 2d 330, 336 (Miss. 1992)).

It is undisputed that Kmart and Fulton entered into a lease agreement, and that the lease agreement contemplated both that Fulton would construct a building in Corinth and that Kmart

4

would be a tenant of the building. The parties apparently agree that the lease agreement constitutes a valid and binding contract between Kmart and Fulton. Thus, the pertinent issues on the breach-of-contract claim are whether Fulton broke or breached the terms of the lease agreement, and whether Kmart was thereby damaged monetarily.

In Mississippi, the lessee of a commercial lease takes the leased premises as the lessee finds them. *Cappaert v. Junker*, 413 So. 2d 378, 379 (Miss. 1982) (citing *Jones v. Millsaps*, 14 So. 440 (Miss. 1893)). Thus, "[i]f [the lessee] wishes to protect himself against the hazards of subsequently occurring accidents or defects requiring repairs, he must do so by proper covenants in his contract of lease." *Id.* (quoting *Jones*, 14 So. at 441). As in this case, a lessor and lessee may agree among themselves regarding particularities of the leasehold and may reflect their wishes in a formal lease agreement. *See Simmons v. Bank of Miss.*, 593 So. 2d 40, 42 (Miss. 1992); *Bondafoam, Inc. v. Cook Constr. Co.*, 529 So. 2d 655, 658 (Miss. 1988); *Richardson v. Borden*, 42 Miss. 71, 1868 WL 2222 (Miss. 1868); *see also* THOMPSON, COMMENTARIES ON THE LAW OF REAL PROPERTY § 80 (Rep. Vol. 1959).

In the case *sub judice*, Kmart alleges that under the terms of the lease agreement Fulton was obligated to maintain Kmart's leased premises in a safe, dry, and tenantable condition, but breached these terms by failing to take flood-protection measures, "such as surrounding the building with a protective membrane" and caulking the exterior, and that these failures caused Kmart to suffer monetary damages when its store premises were flooded. Kmart's Compl. [1] ¶ 59–62; Kmart R. 30(b)(6) Dep. [338-1] at 248.

Fulton argues that its conduct was consistent with the terms of the lease agreement and maintains in support that Kmart approved its own building design and specifications, and did so

5

several years before the lease was assigned to Fulton. Fulton further maintains that Kmart never gave notice to Fulton that the building should be water-proofed or that a protective membrane should be added to the building exterior to prevent flood damage. Thus, Fulton argues that Kmart cannot show that Fulton breached the lease agreement. Fulton further argues that any monetary damage Kmart suffered was the result of the flood itself and not due to any breach of Fulton's contractual obligations under the lease agreement.

The Court notes that it is undisputed that Fulton did not take the flood-protection measures Kmart suggests in its complaint and Rule 30(b)(6) deposition, such as surrounding the building with a protective membrane and caulking the exterior. Thus, the issue on the breach element of the claim is whether Fulton's failure to take those particular flood-protection measures constitutes a breach of the lease agreement. To examine this issue, the Court must examine the terms of the lease agreement itself.

Courts are obligated to enforce a contract that is executed by legally competent parties containing clear and unambiguous terms, and parties are bound by the contract's provisions. *Ivison v. Ivison*, 762 So. 2d 329, 335 (Miss. 2000). "The mere fact that the parties disagree about the meaning of a provision of a contract does not make the contract ambiguous as a matter of law." *Id.* The Court "is not concerned with what the parties may have meant or intended but rather what they said, for the language employed in a contract is the surest guide to what was intended." *Id.* at 336. The meaning of a contract is determined using an objective standard, rather than taking into consideration a subjective intent or a party's belief that may conflict therewith. *Palmere v. Curtis*, 789 So. 2d 126, 131 (Miss. Ct. App. 2001) (citation omitted).

6

The Mississippi Supreme Court has established a three-tiered process for contract interpretation:

> First, we look to the "four corners" of the agreement and review the actual language the parties used in their agreement. [*Pursue Energy Corp. v. Perkins*, 558 So. 2d 349,] 352 [(Miss. 1990)]. When the language of the contract is clear or unambiguous, we must effectuate the parties' intent. *Id.* However, if the language of the contract is not so clear, we will, if possible, "harmonize the provisions in accord with the parties' apparent intent." *Id.* Next, if the parties' intent remains uncertain, we may discretionarily employ canons of contract construction. *Id.* at 352–53 (citing numerous cases delineating various canons of contract construction employed in Mississippi). Finally, we may also consider parol or extrinsic evidence if necessary. *Id.* at 353.

*West v. West*, 891 So. 2d 203, 210–11 (Miss. 2004).

Under Mississippi law, "[a]s a general rule, a party to a contract may break it by renouncing his liabilities under it; by rendering performance impossible; or by totally or partially failing to perform his agreement or undertaking." *Matheney v. McClain*, 161 So. 2d 516, 519 (Miss. 1964). "When either party to a contract fails to perform any of his terms, the contract has been broken." *Id.* at 519–20 (citation omitted).

In arguing their competing positions on the breach-of-contract claim, Kmart and Fulton each point to different provisions of the lease agreement. Kmart points to Section 15(a) and claims that Fulton's failure to take the particular flood-protection measures was a breach of its terms. Section 15(a) provides as follows:

> [Kmart] shall make and pay for all maintenance, replacement[,] and repair necessary to keep the demised premises in a good state of repair and tenantable condition, <u>except for the following maintenance, replacement[,] or repair which shall remain [Fulton's] sole responsibility:</u>

7

> (a) <u>all maintenance, replacement[,] and repair to the roof, outer walls[,] and structural portion of the buildings which shall be necessary to maintain the buildings in a safe, dry[,] and tenantable condition and in good order and repair</u> . . . .

Lease Agreement [248-4] at 11, ¶ 15(a) (emphasis added). Kmart contends that this provision constitutes Fulton's affirmative covenant to take certain measures to protect Kmart from flood damage, including the flood-protection measures outlined by Kmart.

Fulton points to provisions of the lease agreement concerning the site construction and design, and argues that any requested flood-protection measures would have been taken during the construction and design phase of the building, a phase which took place approximately sixteen years prior to Fulton's ownership of the property in 2007, not during the maintenance and repair phase. Fulton maintains that it had nothing to do with the initial site plan or the construction of the subject property. Fulton further maintains that Kmart had full control over the design and construction, but despite this, never requested that the prior landlords surround the building with a protective membrane or otherwise flood-proof the building. Fulton further maintains that even after Fulton acquired ownership of the property Kmart never requested that Fulton take such flood-protection measures. Fulton directs the Court's attention to several provisions of the lease agreement, including the following:

> [Kmart's] said building and site improvements shall be constructed by Landlord, at its sole cost and expense, in accordance with working drawings and specifications prepared by Landlord which shall, with respect to standards of construction and division of responsibility for supplying materials and equipment, substantially satisfy the provisions of [Kmart's] typical store drawings and specifications . . . .
>
> Said typical plans and specifications are subject to the following exceptions and other deviations . . . .:

8

> (a) Such modifications of arrangement of space, location of entrances, exits, and columns and other structural members as shall be indicated on store layout drawings which shall be prepared by [Kmart] and be delivered to Landlord within thirty (30) days after receipt of Landlord's written request therefore, which request shall be accompanied by preliminary building outlines, together with any available elevations and sections;
>
> (b) Changes of type and standards of construction and of arrangement to the extent as shall be required by applicable laws, codes[,] and ordinances.
>
> Said working drawings and specifications shall be submitted to [Kmart] in time to permit a review and approval by [Kmart] prior to commencement of construction . . . In the event [Kmart] shall not inform Landlord of such desired revisions or corrections within sixty (60) days, said working drawings and specifications shall be deemed approved and accepted for the purposes hereof.
>
> Said typical drawings and specifications, and working drawings and specifications as approved by [Kmart] shall constitute a part of this lease . . . .

Lease Agreement [248-4] at 7–8, § 7. Fulton further points to Exhibit C of the lease agreement, which Fulton maintains is an indication that the Kmart store was built to Kmart's specifications. Exhibit C to the lease agreement contains a memo from Kmart's construction department indicating that Kmart was providing Fulton with exterior elevation and signage drawings for the proposed store, and indicates that Kmart was a party to the construction process to ensure its compatability with the development decisions and building design and to "have a meaningful input in these major decisions." Ex. C, Lease Agreement [248-4] at 28–32. Exhibit C further provides:

> The site development design shall encompass all aspects of the proposed Kmart operation[,] i.e.[,] access, site drainage[,] and the relationship of the Kmart floor elevation to adjacent grades, roads[,] and buildings. Land balance shall be consideration but shall not be the overriding factor in the ultimate site design.

9

> Preparation of final engineering drawings or commitments affecting site improvements and development shall not be made by the Developer until approval has been granted by [Kmart].
>
> The design package shall indicate the proposed building location, floor elevation, site-drainage pattern and utilities. . . . The survey shall also include the site description, measurements[,] and all existing utilities. . . .
>
> [Kmart] will review all submitted data and if necessary, visit the site. If in the judgment of [Kmart] the proposed site development design would be detrimental to the Kmart operation, the design will be returned to the Developer for re-study. Upon approval of the Site Development Design by [Kmart], the Developer may proceed with final engineering drawing.

*Id.* at 30–31. According to Fulton's argument, this precise language indicates a clear intent of the parties that Kmart was at all times involved in the construction process and had the final say on the construction and design of the building site and specifications, and that because Kmart never provided notice that any such protective measures should be taken, Fulton had no duty to take the particular flood-protection measures suggested by Kmart.

Whereas the provisions cited by Fulton, including Section 7 and Exhibit C, refer generally to the building site and specifications, Section 15(a) cited by Kmart refers to the landlord's continuing responsibility to maintain and repair the roof, exterior walls, and foundation. Section 15(a) plainly shifts maintenance and repair responsibility to Fulton, the landlord of the property. The language of Section 15(a), and of the lease agreement as a whole, is unclear as to whether the flood-protection measures suggested by Kmart are included in the definition of "necessary maintenance, replacement, and repairs." The flood-protection measures could be interpreted as repair and maintenance issues, rather than construction and design issues. Regardless, however, Kmart's breach-of-contract claim fails on other grounds.

10

Assuming, *arguendo*, Fulton had the affirmative duty to take such flood-protection measures under the lease agreement, Kmart has failed to raise a fact issue that Fulton had notice that such measures were necessary. Although obligations may be required by a lease agreement, Mississippi law is well settled that to be liable, the landlord must have had actual or constructive knowledge of a maintenance issue or defect, as well as a reasonable opportunity to make repairs. *Turnipseed v. McGee*, 109 So. 2d 551, 554 (Miss. 1959); *see also Dulin v. Sowell*, 919 So. 2d 1010, 1012–1013 (Miss. Ct. App. 2005). The reasoning behind the law is apparent. The tenant, who inhabits the leased premises, is likely to know any defects in the premises. The absentee landlord is in no position to know of defects to the premises unless he is informed. Thus, it follows that the lessee must notify the landlord of any discovered defects, and the landlord must make the necessary repairs or face liability for its failure to do so.

Fulton argues that it was unaware of any need for a protective membrane, caulking, or other flood-prevention measure. Kmart does not argue that it provided any notice to Fulton that such measures should be taken; instead, Kmart seems to argue that Fulton had constructive notice that such measures were necessary due to its "knowledge of Kroger's presence in a flood-prone area." *See* Kmart's Mem. Br. Supp. Resp. Opp'n to Fulton's MSJ [296] at 1. Although Kmart presents no argument on notice specifically pertaining to the breach-of-contract claim, in relation to its negligence claim, Kmart cites to a *2010 Elam Draining District News* newsletter article, which it contends includes language from a reprint of a December 1, 2001 *Northeast Mississippi Daily Journal* article concerning a flooding event that year; Kmart maintains that these articles indicate that the 2010 flood giving rise to this suit was not an "unprecedented flooding event for Corinth, Mississippi." *See id.* at 14–15. However, it is undisputed that FEMA issued the LOMR

11

in 2005 removing the building from the floodway due to "Inadvertent Inclusion in Floodway," *see* LOMR from FEMA [259-1] at 1, and apparently Fulton was not assigned the lease agreement until 2007. *See* Fulton's Mem. Br. Supp. MSJ [249] at 5. Further, "[n]ewspaper articles . . . are not proper summary judgment evidence to prove the truth of the facts that they report because they are inadmissible hearsay." *James v. Texas Collin County*, 535 F.3d 365, 374 (5th Cir. 2008) (citing *Roberts v. City of Shreveport, La.*, 397 F.3d 287, 295 (5th Cir. 2005)). Also, the reprinted newspaper article published in the newsletter is hearsay within hearsay. However, even if the Court had considered the newsletter article and reprinted newsletter article as admissible evidence concerning the general nature of flooding in the Corinth and greater Alcorn County area, this evidence is not sufficient to raise a fact issue with respect to constructive notice. *See Dodson v. Hillcrest Secs., Corp.*, 95 F.3d 52, 1996 WL 459770, at *8 (5th Cir. 1996) ("Appellees point to no case . . . in which a single newspaper article was considered significantly widespread to constitute constructive notice, and we find none."); *see also* 58 AM. JUR. 2D NOTICE § 22. For all these reasons, the Court finds that Kmart has failed to raise a genuine dispute of fact that Fulton had actual or constructive notice that such flood-protection measures were necessary to protect the premises from flood damage.

Finally, Kmart has not raised a fact issue on the last element of the breach-of-contract claim concerning whether Kmart sustained monetary damages thereto. Fulton maintains that Kmart has offered no proof that any breach of maintenance or repair obligation was a proximate cause of the flooding, as it is undisputed that this was a 100-year-plus flood and the flooding damage to the Kmart store was caused by landscaping timbers pushing open the back doors of the building. *See* Fulton's Reply Supp. MSJ [338] at 15. Fulton argues that no maintenance or

repair on its part could have prevented the timbers from entering the rear of the Kmart store. Fulton maintains that a statement by Kmart's designated expert, John R. Krewson, confirming that the source of the floodwaters in the Kmart store was the timbers that entered the rear doors of the store absolves Fulton of any liability for breach of contract for lack of maintenance. Kmart argues that flood-protection measures could have prevented the timbers from entering the rear of the store and cites in support the deposition testimony of its Rule 30(b)(6) corporate representative wherein he opines that flood-protection measures would have prevented the flood damage. *See generally* Kmart R. 30(b)(6) Dep. [338-1] at 1–16. Because Kmart's Rule 30(b)(6) representative is not designated as an expert, he may only testify as to his own personal knowledge in a lay opinion. The Court finds that only an expert witness could testify about whether flood-protection measures would have prevented flood damage. Thus, this testimony is likely inadmissible. However, even if the Court considered the testimony, it would be insufficient to raise a fact issue. Thus, the Court finds that Kmart has failed to raise a fact issue that the timber would not have entered the rear doors of the Kmart store if Fulton had taken the flood protection measures suggested by Kmart.

For all of these reasons, the Court finds that no genuine dispute of material fact exists with respect to Kmart's breach-of-contract claim against Fulton, and thus that summary judgment is proper on this claim. The Court now turns to the negligence claim.

### 2. <u>Negligence Claim</u>

Next, Kmart alleges a negligence claim against Fulton. A plaintiff asserting a negligence claim must ultimately prove the essential elements of duty, breach of duty, proximate causation, and damages. *Cascio v. Alfa Mut. Ins. Co.*, No. 2012–CA–01300–COA, 2013 WL 6383041

13

(Miss. Ct. App. Dec. 6, 2013) (citing *Ladner v. Holland*, 90 So. 3d 655, 659 (¶ 13) (Miss. Ct. App. 2012) (in turn citing *Price v. Park Mgmt. Inc.*, 831 So. 2d 550, 551(¶ 5) (Miss. 2002))).

Kmart asserts three theories of recovery on its negligence claim. First, Kmart alleges, as it did with respect to the breach-of-contract claim, that "Fulton did not and has not taken the necessary action to ensure that Kmart's premises and its contents are protected from possible flood waters, such as surrounding the building with a protective membrane and taking other protective measures," and that this alleged failure to take necessary measures caused Kmart to suffer flood damages. Kmart's Compl. [1] ¶¶ 55, 60–62. Second, Kmart alleges that Fulton was aware of the LOMR that allowed the Corinth Kroger store to remain in a regulatory floodway and "knowingly and improperly allowed its building to remain in the floodway." *Id.* ¶ 54. Third, Kmart alleges that "Kroger's presence in the floodway caused a displacement of water and a rise in the water level" resulting in flood damage to the Kmart store and causing Kmart to incur expenses to prevent further water from entering the store. *Id.* ¶ 56–58. The Court looks to each theory of recovery in turn.

First, Kmart alleges that Fulton had a duty to take necessary flood-protection measures, that Fulton breached this duty by failing to take such measures, and that Fulton's failure to take these measures proximately caused the Kmart store to sustain flood damage. Based on the reasoning above in the breach-of-contract claim section, the Court finds that no genuine dispute of material fact exists with respect to whether, even if Fulton had such a duty, Fulton's failure to take such measures proximately caused Kmart's flood damage. Accordingly, summary judgment is warranted on this negligence theory.

14

Second, Kmart alleges that Fulton had a duty to prevent Kroger from being located in a floodway, breached this duty, and that Fulton's breach was a proximate cause of Kmart's flood damage. Fulton argues that it is not liable for constructing the Kroger store in a floodway, because the Kroger store is not located in a floodway, Kmart was not in a floodway at the time of the flood, and Kroger was incorrectly included in the floodway in previous FIRM maps. As the Court has already stated, in 2005, FEMA issued a LOMR removing the Kroger store from the floodway due to "Inadvertent Inclusion in Floodway." *See* LOMR from FEMA [259-1] at 1. Also, as the Court stated in its earlier memorandum opinion [208] ruling on Kroger's motion for judgment on the pleadings [66], Kmart's allegations challenging the issuance of the LOMR and whether the Kroger store was actually in a floodway fall squarely within the ambit of the NFIA and would only be tenable against FEMA, which has the primary responsibility for issuing LOMRs as part of the National Flood Insurance Program. *See, e.g., Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 987–89 (8th Cir. 2010); *Coal. for a Sustainable Delta v. FEMA*, 812 F. Supp. 2d 1089, 1102 (E.D. Cal. 2011). As the Court has already dismissed FEMA from the case *sub judice* on immunity grounds, Kmart is not entitled to offer evidence to prove its allegations concerning whether the issuance of the LOMR was proper. Thus, in viewing Kmart's allegations against Fulton for the location of the Kroger store in the context of summary judgment, the Court assumes that FEMA's determination was correct and that Kroger was not actually located in the floodway. The Court also assumes that FEMA's determination that the remainder of the building was not in a floodway was correct, as well. In light of this, it is the opinion of the Court that Kmart cannot prove that Fulton "knowingly and improperly allowed its building to remain in the floodway," as FEMA has determined that neither the Kroger store nor the building as a whole were at any time

located in the floodway. Therefore, no genuine dispute of material fact exists with respect to this negligence theory. Accordingly, summary judgment is warranted on this negligence theory.

Third, Kmart alleges that "Kroger's presence in the floodway caused a displacement of water and a rise in the water level" resulting in flood damage to the Kmart store and causing Kmart to incur expenses to prevent further water from entering the store. Kmart's Compl. [1] ¶¶ 56–58. As stated above, it is the opinion of this Court that Kmart cannot prove that Kroger was located in a floodway at the time of the flood, given FEMA's determination to the contrary. Fulton contends that Kmart similarly cannot prove that the presence of the Kroger store caused a displacement of water or rise in the water level resulting in Kmart's flood damage. Fulton makes the following arguments in support of this contention.

First, Fulton argues that Kmart has offered no reliable expert proof that the presence of the Kroger store in the building caused any damage to Kmart during the flood, given the flawed data in the report of Kmart's retained engineering expert, John R. Krewson. Fulton refers to Krewson's admission during his deposition that he had made a mistake in flow data when modeling the effect of the Kroger store on the Kmart store; Kmart's subsequent statement that if it were not allowed to amend Krewson's report to reflect the correct flow data, Kmart "[would] be forced to prosecute its case with Mr. Krewson's flawed Initial Report," see Kmart's Mem. Br. Supp. Mot. Appeal Mag. Decision [228] at 9 (emphasis added); and the Court's subsequent denial of Kmart's request to amend Krewson's report.[3] Fulton maintains that without an accurate Krewson report, Kmart has

---

[3] Fulton further maintains that because Krewson admitted he did not include the actual physical conditions present on the ground during the flood in his HEC-RAS studies and only used hypothetical flood conditions, his opinions are irrelevant and unreliable; Fulton cites to an affidavit of its expert, Jamie Monohan, stating the same. However, because the parties agree that the flow data in Krewson's report was inaccurate, the Court need not address this argument.

16

no valid expert testimony to prove the effect of the Kroger store's location on the flood damage sustained by the Kmart store.

Kmart agrees in its response that its proof on the effect of the Kroger store's presence on Kmart's flooding is through Krewson's report. Kmart contends that it has explained through Krewson's testimony why the Kroger store contributed to Kmart's flooding. Kmart maintains that the Court entered an Order allowing Krewson to amend his report to correct the errors present in his initial report. This statement is incorrect. On September 27, 2013, the Court entered an Order [243] stating that it would consider a limited amendment of only mathematical errors to the Krewson report and requesting that Kmart submit the same for the Court's consideration. Although at the time of the parties' briefing on this motion for summary judgment the Court had not yet ruled on Kmart's request to allow the newly proposed amended report reflecting mathematical calculations, on December 18, 2013, the Court entered an Order [346] and memorandum opinion [347] denying Kmart's request. Thus, when Kmart states its proof on this issue is based on the Krewson report, it is relying in part on the flow data contained in the initial Krewson report, which both Kmart and Fulton agree is flawed. Kmart contends that the effect of the Kroger store's presence on the flood damages sustained by Kmart is a question of fact for the jury. But this could only be a question of fact for the jury if Kmart raised a fact question for trial on this issue. Kmart does not present any other evidence in support of its theory that the Kroger store's presence affected Kmart's flood damages except Krewson's opinions contained in his initial flawed report. In so doing, Kmart has failed to raise a fact issue, and thus, Fulton is entitled to summary judgment on this negligence theory. However, this negligence theory also fails on at least one other ground, as well.

17

As Fulton argues in its motion for summary judgment, an additional ground for dismissal of this negligence theory is that Kmart approved of the Kroger location in the lease agreement and is bound by the terms of its contract. Specifically, Fulton directs the Court's attention to Section 12 of the lease agreement which provides as follows:

> Landlord represents, warrants[,] and covenants that it shall, prior to commencement of the lease term, complete the buildings and site improvements substantially in accordance with the site plan depicted on said Exhibit "B," including completion of said common areas in accordance with the provisions of Article 10 hereof. Landlord further covenants that it will not erect any buildings or other structures on the land described in Exhibit "A" except as shown on said Exhibit "B."
>
> Landlord also represents, warrants, and covenants that a grocery Tenant . . . shall be located within a shopping center premises as depicted on Exhibit "B" and shall open for business or [be] ready to open for business concurrently with [Kmart's] opening.

Lease Agreement [284-4] at 10, § 12. Exhibit "B" depicts Kmart adjacent to shops and a neighboring grocery store tenant.

Kmart maintains that it did not expressly approve the Kroger store location in the lease agreement, stating that Kmart "had the opportunity, not the obligation" to comment regarding the location of Kroger and cites Kmart's Rule 30(b)(6) deposition testimony to this effect. *See* Kmart Rule 30(b)(6) Dep. [295-6] at 127. Kmart further maintains that the language of the lease reveals that the requirement of a grocery store tenant (Kroger) was a covenant of the landlord: "Landlord represents, warrants[,] and covenants that a grocery Tenant . . . shall be located within a shopping center premises." Lease Agreement [284-4] at 10, ¶ 12. Finally, Kmart maintains in this respect that both Fulton and Kmart would benefit from such a provision. Kmart maintains that it "simply signed a lease in which the landlord provided for a grocery store [Kroger] to be in the shopping

18

center as well," but "did not sign its rights away to complain of damage to it caused by that store . . . ." Kmart's Mem. Br. Supp. Resp. to Fulton's MSJ [296] at 9.

However, the Court finds that the clear language of Section 12 indicates that Kmart was aware of and agreed to (1) Fulton's intention to erect the part of the building where Kroger would later be located (the "grocery tenant" part of the building), (2) the location of the grocery tenant part of the building with respect to Kmart's location in the building, and (3) the size of the grocery tenant part of the building, as well as Kmart's agreement to lease the premises from Fulton with this understanding. Although none of this precludes Kmart from presenting proof at trial on a negligence claim against Fulton, it does preclude Kmart from presenting proof at trial on a negligence claim premised on the theory that Kroger should not have been located in the grocery tenant portion of the building, when Kmart has already indicated its agreement to such an arrangement, and according to the record, never indicated otherwise until after the flood damage it sustained.

Based on all the foregoing, the Court finds that Kmart has failed to raise a genuine dispute of material fact that would preclude summary judgment on its three theories of negligence against Fulton, and thus that Kmart's negligence claim against Fulton cannot survive summary judgment.[4]

### D. Conclusion

In sum, Defendant Fulton Improvements, LLC's motion for summary judgment [248] is **GRANTED** in its entirety; all claims against Defendant Fulton Improvements, LLC are **DISMISSED**; and Defendant Fulton Improvements, LLC is **DISMISSED** as a party to the case.

---

[4] Because the Court finds that Kmart's negligence claim against Fulton fails to survive summary judgment, the Court need not reach Fulton's alternative arguments that Kmart's claim fails under principles of estoppel or that the flood was an Act of God which allowed no preparation for flood protection.

An order in accordance with this opinion shall issue this day.

THIS, 21st day of January, 2014.

_____
SENIOR JUDGE